UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WESLEY BOWER II, #821321,

    Petitioner,         Hon. Paul L. Maloney

v.               Case No. 1:16-CV-1194

SHANE JACKSON,

    Respondent.
_____/

## REPORT AND RECOMMENDATION

    This matter is before the Court on Bower's petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Bower's petition be **denied**.

## BACKGROUND

    As a result of events occurring on or about October 17, 2010, Petitioner was charged with murder and possession of a firearm during the commission of a felony.  (Trial Transcript, October 11, 2011, at PageID.454).   Several individuals testified at Petitioner's jury trial.   The relevant portions of their testimony are summarized below.

**PROSECUTION WITNESSES**

**Todd Myers**

    As of October 17, 2010, Myers was employed as the "Assistant Director for Newaygo County 9-1-1."  (Trial Transcript, October 11, 2011, at PageID.649).   The Newaygo County system was designed to record all incoming emergency calls.  (Trial Transcript, October

11, 2011, at PageID.649).   On October 17, 2010, Newaygo County received an emergency call "from the Bower residence."   (Trial Transcript, October 11, 2011, at PageID.649-50).   The call was received by Erin Washburn.   (Trial Transcript, October 11, 2011, at PageID.650).   Myers later made a copy of the audio recording of this telephone call.   (Trial Transcript, October 11, 2011, at PageID.650).

**Joseph Bozek**

As of October 17, 2010, Bozek was employed as a Trooper with the Michigan State Police.   (Trial Transcript, October 11, 2011, at PageID.652).   Bozek was on duty that day and at approximately 4:30 p.m. he was dispatched to investigate "a shooting complaint at a residence" located at 6621 West 100th Street in Fremont.   (Trial Transcript, October 11, 2011, at PageID.652-53).   When Trooper Bozek arrived at the residence, Petitioner was outside the residence walking toward Trooper Brian Bitson, who had arrived just moments earlier.   (Trial Transcript, October 11, 2011, at PageID.653-54).   Trooper Bitson gained custody of Petitioner while Trooper Bozek entered the residence where he discovered Heather Bower's lifeless body. (Trial Transcript, October 11, 2011, at PageID.654-59).

**Larry Andres**

As of October 17, 2010, Andres was employed as a Trooper with the Michigan State Police.   (Trial Transcript, October 11, 2011, at PageID.687-88).   On this date, Andres was dispatched to investigate a shooting at 6621 West 100th Street.   (Trial Transcript, October 11, 2011, at PageID.688).   By the time Andres arrived at the residence, Troopers Bozek and Bitson were already on the scene.   (Trial Transcript, October 11, 2011, at PageID.688).   Trooper Andres then placed Petitioner into his vehicle and transported him to the Michigan State Police Post in Newaygo.   (Trial Transcript, October 11, 2011, at PageID.688-90).   When Trooper

Andres later collected Petitioner's clothing, he noticed that there were "small, little spots of blood" on Petitioner's shoes.   (Trial Transcript, October 11, 2011, at PageID.690-93).

**Brian Bitson**

As of October 17, 2010, Bitson was employed as a Trooper with the Michigan State Police.   (Trial Transcript, October 11, 2011, at PageID.704).   On this date, Bitson was dispatched to investigate a shooting at 6621 West 100th Street.   (Trial Transcript, October 11, 2011, at PageID.704-06).   Trooper Bitson was the first member of law enforcement to arrive at the residence at which point Petitioner was outside "sitting in a lawn chair."   (Trial Transcript, October 11, 2011, at PageID.706-07).   When Trooper Bitson arrived, Petitioner immediately began walking toward him.   (Trial Transcript, October 11, 2011, at PageID.707).   Petitioner, as he approached Bitson, made the unsolicited statement that "he just shot his wife and he thinks he killed her."   (Trial Transcript, October 11, 2011, at PageID.707-08).   Trooper Bitson then placed Petitioner in handcuffs.   (Trial Transcript, October 11, 2011, at PageID.708).   Trooper Andres arrived soon thereafter and took custody of Petitioner at which point Trooper Bitson entered the Bower residence where he observed Heather Bower's body.   (Trial Transcript, October 11, 2011, at PageID.709-11).   In the room where Heather Bower's body was discovered, Trooper Bitson discovered a shotgun and three spent shotgun shells, one of which was still located inside the shotgun.   (Trial Transcript, October 11, 2011, at PageID.711-19).

**Dale Goodrich**

As of October 17, 2010, Goodrich was employed as a Trooper with the Michigan State Police.   (Trial Transcript, October 12, 2011, at PageID.758-59).   On this date, Goodrich was dispatched to 6621 West 100th Street to assist in processing a crime scene.   (Trial Transcript, October 12, 2011, at PageID.759-60).

**Matthew Kempf**

As of October 17, 2010, Kempf was employed as a Medical Examiner Investigator for Newaygo County.  (Trial Transcript, October 12, 2011, at PageID.793-94).   On this date, Kempf recovered Heather Bower's body and transported it to Mercy Hospital in Muskegon where an autopsy was later performed.   (Trial Transcript, October 12, 2011, at PageID.794-96).

**Russell Karsten**

As of October 17, 2010, Karsten was employed as a Trooper with the Michigan State Police assigned to the firearms and tool marks section of the Grand Rapids Forensic Science Laboratory.  (Trial Transcript, October 12, 2011, at PageID.797-804).   Karsten was qualified as an expert witness in the area of shot pattern analysis and firearms and tool markings.  (Trial Transcript, October 12, 2011, at PageID.804).   Trooper Karsten analyzed the shotgun and shotgun shells recovered from the crime scene and determined that the shotgun shells recovered from the scene were "cycled through that shotgun" based upon markings located on the spent shotgun shells.  (Trial Transcript, October 12, 2011, at PageID.804-14).

**Paul Campbell**

As of July 20, 2003, Campbell was employed as a Trooper with the Michigan State Police.  (Trial Transcript, October 12, 2011, at PageID.855).   On this date, Trooper Campbell was dispatched to a hospital to investigate a domestic assault complaint made by Heather Bower. (Trial Transcript, October 12, 2011, at PageID.855).   Campbell observed that Heather Bower had "some bruising above, around her right temple, as well as a large bruise on her left forearm, and some lower bruising on her lower, left leg."  (Trial Transcript, October 12, 2011, at PageID.855-56).   Trooper Campbell's investigation revealed that Petitioner assaulted Heather Bower during a dispute "centered around property, their children, and who had the better setting for the children

to be at." (Trial Transcript, October 12, 2011, at PageID.857). As a result of this incident, Petitioner was charged with domestic violence, but the charges were subsequently dropped. (Trial Transcript, October 12, 2011, at PageID.858).

**Brian Kolk**

As of June 6, 2002, Kolk was employed as a Deputy with the Newaygo County Sheriff's Department. (Trial Transcript, October 12, 2011, at PageID.859, 864). On this date, Kolk was dispatched to investigate a claim of malicious property destruction. (Trial Transcript, October 12, 2011, at PageID.859-60). Specifically, Petitioner alleged that his "wife or soon to be ex-wife" ran over his mailbox. (Trial Transcript, October 12, 2011, at PageID.860). Deputy Kolk's investigation failed to uncover evidence that Petitioner's wife ran over the mailbox. (Trial Transcript, October 12, 2011, at PageID.860-61).

Deputy Kolk again encountered Petitioner on December 15, 2009, when Petitioner reported that his wife and children "had left the house a couple of days before that and he had not seen or heard from them since." (Trial Transcript, October 12, 2011, at PageID.861). Petitioner reported that "he thought maybe his wife and children had left because his wife was upset about his discipline on one of his children." (Trial Transcript, October 12, 2011, at PageID.862). Kolk contacted an individual with Child Protective Services who indicated that a report had been made regarding the matter and an investigation was being coordinated. (Trial Transcript, October 12, 2011, at PageID.862).

On June 4, 2010, Petitioner reported to Deputy Kolk that his ex-wife had stolen some of his belongings. (Trial Transcript, October 12, 2011, at PageID.862-63). Specifically, Petitioner reported that his ex-wife had recently been serving "as a live-in house assistant" while he was recuperating from an injury and that while doing so she had stolen certain personal items

belonging to Petitioner.    (Trial Transcript, October 12, 2011, at PageID.862-63).    After speaking with Petitioner's ex-wife regarding Petitioner's allegations, Kolk "closed [the] complaint."   (Trial Transcript, October 12, 2011, at PageID.863).

**Timothy Dunn**

Dunn testified that he had known Petitioner for "a little over twenty years."   (Trial Transcript, October 12, 2011, at PageID.866-67).   The pair served together in the National Guard and later worked together as a truck driving team.    (Trial Transcript, October 12, 2011, at PageID.867-70).   Petitioner owned firearms, was a "good shot," and did not leave his firearms "sitting out in the house," but rather stored them in a gun safe.   (Trial Transcript, October 12, 2011, at PageID.871-72, 879).   In late 2009 extending into 2010, Petitioner was involved in "more court action regarding custody and parenting time between [Petitioner] and Heather." (Trial Transcript, October 12, 2011, at PageID.877).   It also "seemed like" Petitioner's "parenting time" with his children was "lessened or restricted" at this time.   (Trial Transcript, October 12, 2011, at PageID.878).

**Clarence Bower**

Clarence Bower is Petitioner's uncle.   (Trial Transcript, October 12, 2011, at PageID.893).   Petitioner often discussed his marital difficulties with Bower.   (Trial Transcript, October 12, 2011, at PageID.893-94).   Petitioner "repeatedly" complained to Bower that "he was denied parenting time, not given certain time that he thought he should have for parenting time hours."   (Trial Transcript, October 12, 2011, at PageID.903-04).   On one occasion in the "early summer of 2010," Petitioner stated that "he was just tired of going to court and tired of Heather keeping the kids from him and that he was going to shoot her."   (Trial Transcript, October 12, 2011, at PageID.894-95).   Petitioner also stated that Heather "was trying to keep his kids from

him and if he couldn't have his kids nobody could have them."  (Trial Transcript, October 12, 2011, at PageID.899).  When Bower told Petitioner, "you don't want to do that," Petitioner responded that "it would just cure a lot of problems."  (Trial Transcript, October 12, 2011, at PageID.895-96).  However, Bower did not believe that Petitioner would actually shoot Heather. (Trial Transcript, October 12, 2011, at PageID.896).  Bower also witnessed Petitioner's children say that they did not want to visit with Petitioner.  (Trial Transcript, October 12, 2011, at PageID.896).

**Tracy Pagel**

Pagel is Petitioner's younger sister.  (Trial Transcript, October 12, 2011, at PageID.911).  Heather Bower was Pagel's best friend and confidant.  (Trial Transcript, October 12, 2011, at PageID.912-13).  In the fall of 2009, Pagel spent "a lot" of time at Petitioner's residence.  (Trial Transcript, October 12, 2011, at PageID.914).  Pagel observed Petitioner, "at times," lose his temper and start "screaming at the top of his lungs."  (Trial Transcript, October 12, 2011, at PageID.914-17).  Pagel described the relationship between Petitioner and Heather Bower as "turbulent."  (Trial Transcript, October 12, 2011, at PageID.918).

**Gwendolyn Bower**

Gwendolyn Bower is Petitioner's step-mother, having married Petitioner's father in 1999.  (Trial Transcript, October 12, 2011, at PageID.949-50).  Shortly after Bower married Petitioner's father, the pair had a falling out with Petitioner after which they ceased communicating with Petitioner.  (Trial Transcript, October 12, 2011, at PageID.950).  The dispute centered around Petitioner's belief that his father should give his prior residence to him.  (Trial Transcript, October 12, 2011, at PageID.950).  Petitioner "tried to be very controlling" of his father and refused to reconcile with his father unless it was on his terms.  (Trial Transcript, October 12,

2011, at PageID.950-51).   Subsequent attempts to reconcile with Petitioner were unsuccessful. (Trial Transcript, October 12, 2011, at PageID.952-54).

Petitioner was also "very controlling" of Heather.   (Trial Transcript, October 12, 2011, at PageID.951).   In December 2009, Heather told Bower that Petitioner had "spanked" one of their children "excessively."   (Trial Transcript, October 12, 2011, at PageID.954-55).   Bower told Heather that "if she did not remove the children" from Petitioner's residence, she would "call the authorities and turn her in as failure to protect her children from their father."   (Trial Transcript, October 12, 2011, at PageID.955).   Heather and her children moved in with Bower and Petitioner's father the next day.   (Trial Transcript, October 12, 2011, at PageID.955).   In March 2010, Heather obtained a residence for her and her children.   (Trial Transcript, October 12, 2011, at PageID.956).   Heather was "terrified" of Petitioner and told Bower that "she knew [Petitioner] was going to kill her she just didn't know when."   (Trial Transcript, October 12, 2011, at PageID.961-62).

**Sharon Couts**

Approximately ten days before Heather Bower was killed, Bower asked Couts to accompany her to Petitioner's residence.   (Trial Transcript, October 13, 2011, at PageID.1004-05).   Petitioner told Bower that he would return some of her belongings, but Bower did not want to go to Petitioner's residence alone.   (Trial Transcript, October 13, 2011, at PageID.1005).   Couts agreed, but when she and Bower arrived at Petitioner's residence, Petitioner told Bower to leave.   (Trial Transcript, October 13, 2011, at PageID.1006).

**Ashley Herman**

Herman and Heather Bower we co-workers from approximately October 2008 to June 2010.   (Trial Transcript, October 13, 2011, at PageID.1015).   The pair were very close and

would see each other "like every day."  (Trial Transcript, October 13, 2011, at PageID.1016).

Bower confided to Herman about her relationship with Petitioner.  (Trial Transcript, October 13,

2011, at PageID.1016-17).  Bower talked about "leaving [Petitioner] once and for all," but she

"was afraid to."  (Trial Transcript, October 13, 2011, at PageID.1024-25).

Herman visited Heather Bower at her residence "around noon" on the day she was

killed.  (Trial Transcript, October 13, 2011, at PageID.1027-28).  During Herman's visit, Bower

received a telephone call from Petitioner.  (Trial Transcript, October 13, 2011, at PageID.1028).

After the conversation ended, Bower told Herman that Petitioner wanted Bower to deliver his half

of their kids' school pictures.  (Trial Transcript, October 13, 2011, at PageID.1031).

**Cathy Wirt**

Wirt is Heather Bower's mother.  (Trial Transcript, October 13, 2011, at

PageID.1046).  Bower and Petitioner were divorced in 2002.  (Trial Transcript, October 13,

2011, at PageID.1077).  Following their divorce, Petitioner and Bower would occasionally "get

back together again."  (Trial Transcript, October 13, 2011, at PageID.1077).  Bower would

"move back in" with Petitioner "because he would threaten to take the children."  (Trial

Transcript, October 13, 2011, at PageID.1077).

As of October 17, 2010, Wirt was living with Bower.  (Trial Transcript, October

13, 2011, at PageID.1052).  Sometime that morning, Petitioner telephoned Bower.  (Trial

Transcript, October 13, 2011, at PageID.1053-54).  Petitioner told Bower that he wanted to meet

with her alone at a nearby lake.  (Trial Transcript, October 13, 2011, at PageID.1055-56).

Instead, Bower, Wirt, and Bower's two children later drove to Petitioner's residence.  (Trial

Transcript, October 13, 2011, at PageID.1056-59).

Everybody entered the residence and soon thereafter, Petitioner and Bower went into a bedroom.  (Trial Transcript, October 13, 2011, at PageID.1059-64).  Wirt then heard "a bang and then [another] bang" coming from a bedroom.  (Trial Transcript, October 13, 2011, at PageID.1066-67).  Wirt and Petitioner's daughter, Courtney Bower, immediately ran to the bedroom in question.  (Trial Transcript, October 13, 2011, at PageID.1066-68).  The door to the bedroom was locked, so Wirt and Bower began kicking and banging on the door.  (Trial Transcript, October 13, 2011, at PageID.1068).  Wirt then heard another bang coming from the bedroom.  (Trial Transcript, October 13, 2011, at PageID.1068).

Petitioner then exited the bedroom and stated, "I just took care of your mother, so you can't have her because she was going to take you guys away from me."  (Trial Transcript, October 13, 2011, at PageID.1069-70).  Petitioner then stated, "call the cops.  I'll be on the patio."  (Trial Transcript, October 13, 2011, at PageID.1071).  Wirt entered the bedroom and discovered her daughter's body.  (Trial Transcript, October 13, 2011, at PageID.1071-72).  Wirt immediately knew that her daughter was dead because "her whole face was blown away."  (Trial Transcript, October 13, 2011, at PageID.1072).

**Brandon Bower**

Bower is Petitioner and Heather Bower's son.  (Trial Transcript, October 13, 2011, at PageID.1109, 1112).  Petitioner owned "lots of guns."  (Trial Transcript, October 13, 2011, at PageID.1109).  Petitioner stored his weapons in a gun safe and did not "leave guns sitting around in the house."  (Trial Transcript, October 13, 2011, at PageID.1109-10).  Petitioner was a "good shot."  (Trial Transcript, October 13, 2011, at PageID.1112).

Bower described an incident that occurred in December 2009.  On the day in question, Bower and his cousin were riding a motorbike when Petitioner exited the house "yelling"

10

and accusing Bower of making too much noise.  (Trial Transcript, October 13, 2011, at PageID.1115).  Petitioner instructed Bower to come inside because he "was getting spankings." (Trial Transcript, October 13, 2011, at PageID.1115).  When Bower entered the house, Petitioner struck Bower "like thirty" times.  (Trial Transcript, October 13, 2011, at PageID.1115). Heather Bower, and her children, moved out of Petitioner's residence later that day.  (Trial Transcript, October 13, 2011, at PageID.1116-16).

On the day that his mother was killed, Bower and his cousin went to a local skate park.  (Trial Transcript, October 13, 2011, at PageID.1117).  At some point that morning, Petitioner arrived at the skate park and spoke with Bower.  (Trial Transcript, October 13, 2011, at PageID.1134).  Later that day, Bower accompanied his mother, sister, and grandmother to Petitioner's residence.  (Trial Transcript, October 13, 2011, at PageID.1117-23).  Petitioner exited his residence and the group remained outside for a period of time.  (Trial Transcript, October 13, 2011, at PageID.1120-24).  Petitioner and Heather Bower eventually entered the residence.  (Trial Transcript, October 13, 2011, at PageID.1123).  Bower entered the residence a short time later and began playing video games.  (Trial Transcript, October 13, 2011, at PageID.1124).  Bower then heard two gunshots coming from a bedroom.  (Trial Transcript, October 13, 2011, at PageID.1125-26).  Bower immediately exited the house and ran to his cousin's house nearby.  (Trial Transcript, October 13, 2011, at PageID.1126).  As soon as Bower heard the gunshots, he thought "my mom is dead" because Petitioner had previously stated that he would kill her.  (Trial Transcript, October 13, 2011, at PageID.1127).

**Dr. Brian Hunter**

Dr. Hunter, a forensic pathologist, performed an autopsy on Heather Bower on October 18, 2010.  (Trial Transcript, October 13, 2011, at PageID.1153-56).  Bower died from

shotgun wounds to the left side of the face, right chest and the left upper back inflicted from almost point blank range.   (Trial Transcript, October 13, 2011, at PageID.1159, 1163-78, 1182).

**Courtney Bower**

Bower is Petitioner and Heather Bower's daughter.   (Trial Transcript, October 13, 2011, at PageID.1200).   Petitioner owned "a bunch of guns" which he stored in a gun safe. (Trial Transcript, October 13, 2011, at PageID.1200-01).   Petitioner did not leave his guns just laying around the house.   (Trial Transcript, October 13, 2011, at PageID.1201).

Petitioner "could be fine one second and then you do one little thing wrong and [he would] start screaming at you."   (Trial Transcript, October 13, 2011, at PageID.1203-04).   This behavior scared Bower.   (Trial Transcript, October 13, 2011, at PageID.1204).   Bower, her brother, and her mother moved out of Petitioner's residence following an incident in which Petitioner spanked her brother.   (Trial Transcript, October 13, 2011, at PageID.1204-07). Petitioner would often travel to Heather Bower's residence where the two could be heard yelling outside.   (Trial Transcript, October 13, 2011, at PageID.1214).

On the day her mother was killed, Bower accompanied her mother, her brother, and her grandmother to Petitioner's residence.   (Trial Transcript, October 13, 2011, at PageID.1215-22).   Petitioner exited his residence and eventually asked Heather Bower "if they could talk" at which point the pair entered the residence.   (Trial Transcript, October 13, 2011, at PageID.1215-23).   After entering the residence, Bower was sitting with her brother and grandmother when she heard two gunshots in quick succession.   (Trial Transcript, October 13, 2011, at PageID.1224-26).   Bower and her grandmother ran to the door of the room where Petitioner and Heather Bower were located and began "pounding on the door."   (Trial Transcript, October 13, 2011, at PageID.1226).   Bower then heard a third gunshot.   (Trial Transcript, October 13, 2011, at

PageID.1226).   A few seconds later, Petitioner exited the room.   (Trial Transcript, October 13, 2011, at PageID.1228).   When Bower asked Petitioner why he shot her mother, Petitioner stated, "because she was going to try and take you away from me."   (Trial Transcript, October 13, 2011, at PageID.1231).

**Scott Rios**

As of October 17, 2010, Rios was employed as a Detective Sergeant with the Michigan State Police.   (Trial Transcript, October 13, 2011, at PageID.1261-62).   That afternoon, Rios was informed that a shooting had occurred earlier that day and that the suspect was in custody.   (Trial Transcript, October 13, 2011, at PageID.1262).   Rios proceeded to the Michigan State Police Post where he spoke with Petitioner.   (Trial Transcript, October 13, 2011, at PageID.1262).   Rios' interview of Petitioner was videotaped and played for the jury.[1]   (Trial Transcript, October 13, 2011, at PageID.1264-65).

During this interview, Petitioner stated that the dispute which led to Heather Bower's killing "was a custody thing."   (Trial Transcript, October 14, 2011, at PageID.1284). Petitioner told Rios that earlier that day, he spoke with Brandon Bower at a local park.   (Trial Transcript, October 14, 2011, at PageID.1289-90).   Brandon told Petitioner that "he was not to talk to [Petitioner] or [Petitioner would] lose time" with him.   (Trial Transcript, October 14, 2011, at PageID.1290).   Brandon also told Petitioner that if Petitioner "stop[ped] by the trailer [he] would lose Wednesday with the kids."   (Trial Transcript, October 14, 2011, at PageID.1290).

**DEFENSE WITNESSES**

**Darl Goodspeed**

---

1 The videotape of this interview is not included in the material submitted to the Court.   The record does contain what purports to be a transcription of this interview.   (ECF No. 7-21 at PageID.1959-67).   This document is not accompanied, however, by any certification or other assertion that the transcription is complete and accurate.

As of May 26, 2002, Goodspeed was employed as a Newaygo County Deputy Sheriff.  (Trial Transcript, October 14, 2011, at PageID.1341-42).   On this date, Goodspeed was contacted by Petitioner concerning a "parenting time dispute."  (Trial Transcript, October 14, 2011, at PageID.1342-43).   Goodspeed spoke with Petitioner, but was unable to locate Heather Bower or the children.  (Trial Transcript, October 14, 2011, at PageID.1343).   Goodspeed determined that Petitioner and Heather Bower were divorced, but living together, and that no court had issued an order "as to who had custody of the children."   (Trial Transcript, October 14, 2011, at PageID.1343-44).   In the absence of a court order regarding custody, Goodspeed determined it was a civil matter with which law enforcement does not concern itself.  (Trial Transcript, October 14, 2011, at PageID.1343-44).

## Chad Palmiter

As of May 27, 2002, Palmiter was employed as a Newaygo County Deputy Sheriff. (Trial Transcript, October 14, 2011, at PageID.1345).   At approximately 9:00 p.m. that evening, Palmiter was dispatched to Petitioner's residence to investigate a "child custody and possible domestic" complaint.  (Trial Transcript, October 14, 2011, at PageID.1345-46).   Palmiter spoke with Petitioner and observed "scratches" on his arms and a "bruise" on one of his wrists.  (Trial Transcript, October 14, 2011, at PageID.1346-47).

## Don Austin

As of June 25, 2002, Austin was employed as a Newaygo County Deputy Sheriff. (Trial Transcript, October 14, 2011, at PageID.1348).   On this date, Austin was dispatched to Petitioner's residence, but Austin could not recall the incident or who he spoke with.  (Trial Transcript, October 14, 2011, at PageID.1348-49).

**Jon Geeting**

As of May 23, 2010, Geeting was employed as a police officer for the City of Fremont.  (Trial Transcript, October 14, 2011, at PageID.1350).   That afternoon, Geeting spoke with Heather Bower regarding a "civil dispute" involving Petitioner.  (Trial Transcript, October 14, 2011, at PageID.1350).   Bower alleged that she heard a knock on her door and when she opened her door, Petitioner was standing outside her residence.  (Trial Transcript, October 14, 2011, at PageID.1352).   Bower did not want to speak with Petitioner, so she attempted to close her door at which point Petitioner "pushed the door open with such force that it struck her and knocked her down on the couch."   (Trial Transcript, October 14, 2011, at PageID.1352-53).

During his conversation with Bower, Geeting learned that Bower had previously obtained a Personal Protection Order against Petitioner, but had subsequently "dismissed it." (Trial Transcript, October 14, 2011, at PageID.1350-51).   Bower indicated that she dismissed the Personal Protection Order against Petitioner because Petitioner "had previously been involved in an automobile accident, she wanted to help him recover, and she felt it would be easier to, with the visitation for the children, to lift the Personal Protection Order."  (Trial Transcript, October 14, 2011, at PageID.1353).

Following the presentation of evidence, the jury found Petitioner guilty of first degree murder and possession of a firearm during the commission of a felony.  (Trial Transcript, October 14, 2011, at PageID.1427-28).   Petitioner was sentenced to serve life in prison without the possibility of parole.   (Sentencing Transcript, November 7, 2011, at PageID.1446). Petitioner subsequently appealed his conviction in the Michigan Court of Appeals asserting the following claims:

I.    The trial court violated Appellant's due process rights by permitting the jurors to ask questions of witnesses during trial.

II.     Defense trial counsel was constitutionally ineffective in failing to object, and the trial court violated Appellant's due process rights, by admitting unfairly prejudicial evidence of alleged prior domestic violence not tending to show motive or intent for the present incident.

III.    The trial court violated Appellant's due process rights by admitting the decedent's hearsay statements, where Appellant did not kill the decedent to prevent her from testifying.

IV.     Defense trial counsel was constitutionally ineffective in failing to move to disqualify the prosecutor, who had previously represented Appellant in a domestic violence case involving the same complainant as the present murder case.

V.      The trial court violated the ex post facto clauses of the both the federal and Michigan Constitutions by imposing a statutory $130 Crime Victim Rights Fund assessment where the statute in effect at the time of the commission of the sentencing offense provided for a $60 assessment.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Bower*, 2013 WL 3107500 (Mich. Ct. App., June 20, 2013).   Raising the same issues, Petitioner appealed the matter to the Michigan Supreme Court which likewise affirmed his conviction. *People v. Bower*, 846 N.W.2d 391 (Mich. 2014).   Petitioner subsequently moved in the trial court for relief from judgment, asserting the following claims:

I.      Petitioner was denied his fundamental due process protections as guaranteed under both state and federal constitutions by and through numerous jurisdictional defects presented herein, which void Petitioner's convictions and which demand his immediate release from his unlawful confinement.

II.     Petitioner was denied a fair trial as guaranteed under both federal and state constitutions, when the trial court failed to control Petitioner's criminal proceedings by allowing a mentally ill defendant to engage in criminal trial proceedings without first ascertaining his competency.

III.    Petitioner was denied his fundamental due process protections to a fair trial as guaranteed under both state and federal constitutions, when the trial court omitted complete jury instructions, which jurisdictional defect resulted in structural error, and mandates a new trial under the automatic reversal doctrine.

IV.   Petitioner was denied his constitutional and fundamental due process protections to a fair trial as guaranteed under both state and federal constitutions, when the prosecution committed both constitutional error and violated the public trust when it proceeded against Petitioner without ascertaining his competency.

V.    Petitioner was denied his fundamental due process protections as guaranteed under both federal and state constitutions, when defense counsel abandoned Petitioner in his representation as enumerated herein, the result of which is structural error.

VI.   Petitioner was denied his fundamental and constitutional rights to due process as guaranteed under both federal and state constitutions, when appellate counsel failed to master the trial record and raise this meritorious 'dead bang winner' issues on Petitioner's right of appeal.

VII.  Petitioner was denied his fundamental protections to a fair criminal proceeding by and through the cumulative effect of error that took place at the hands of the trial court, the prosecution, defense counsel and appellate counsel.

VIII. Relief from judgment should be granted where Petitioner can establish 'good cause' for not bringing his issue before the court previously, and 'actual prejudice' due to the issue of his competency and the government's continuing refusal to resolve that fact; thus, res judicata does not apply because of Petitioner's right to continue seeking relief to correct a manifest injustice.

The trial court denied Petitioner's motion on the ground that it lacked merit. *People v. Bower*, File No. 2010-9801-FC, Order (Newaygo County Cir. Ct., Apr. 14, 2015). Asserting the same issues, Petitioner unsuccessfully moved in the Michigan Court of Appeals for leave to appeal.  *People v. Bower*, No. 328311, Order (Mich. Ct. App., Oct. 2, 2015).  The Michigan Supreme Court likewise denied Petitioner's application for leave to appeal.  *People v. Bower*, No. 152496, Order (Mich., July 26, 2016).  On October 3, 2016, Petitioner initiated the present action asserting the thirteen (13) issues identified above.

17

## STANDARD OF REVIEW

Bower's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly

incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307.  Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   While this standard is "demanding" it is "not insatiable."   *Id.* For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).   This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."   *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."   *Id.* at 784-85.   Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."   *Id.*   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where

20

state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.       Procedural Default**

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

Respondent argues that Petitioner has procedurally defaulted several of the claims presented in this matter.  The Court, however, is not obligated to address Respondent's procedural default argument and can instead simply decide Peterson's petition on the merits.  *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).  Accordingly, the Court opts to simply address Petitioner's claims on the

merits.  *See, e.g., McLemore v. Bell*, 503 Fed. Appx. 398, 404 (6th Cir., Oct. 31, 2012) (observing that when facing "the analytical morass in which procedural-default rules ensnare us," "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision").   The only question is the standard of review to be applied to such claims.

Several of the claims which Respondent asserts have been procedurally defaulted were raised by Petitioner on direct appeal.   The Michigan Court of Appeals, however, found that such had been defaulted by Petitioner's failure to properly assert the issues below.   *Bower*, 2013 WL 3107500 at *1-6 (Mich. Ct. App., June 20, 2013).   The court nevertheless addressed the issues for "plain error."   *Ibid.*   As the Sixth Circuit has recently made clear, state court review of a claim for "plain error" constitutes an adjudication on the merits to which AEDPA deference is accorded.   *See Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017); *Bacall v. Stoddard*, 716 Fed. Appx. 502, 507 (6th Cir., Nov. 29, 2017); *Dixon v. Burt*, 2018 WL 2016252 at *2 (6th Cir., Apr. 30, 2018).

Other claims which Respondent argues has been procedurally defaulted were first asserted by Petitioner in his post-conviction motion for relief.   As noted above, the trial court denied this motion on the merits.   The Michigan Court of Appeals and the Michigan Supreme Court both denied Petitioner leave to appeal this determination, issuing brief form orders citing to Michigan Court Rule 6.508.   While invocation of this court rule raises the possibility that Petitioner has procedurally defaulted the claim in question, the Sixth Circuit has held that such form orders are insufficient to establish procedural default.   *See Guilmette v. Howes*, 624 F.3d 286, 288-92 (6th Cir. 2010); *Peoples v. Lafler*, 734 F.3d 503, 511 (6th Cir., 2013).   Instead, the Court must look to the "last reasoned state court opinion" to determine whether a particular claim

has been denied on the merits or for failure to comply with a state procedural requirement. *Guilmette*, 624 F.3d at 291.   Here, the "last reasoned state court opinion," is the decision by the trial judge denying on the merits Petitioner's motion for relief from judgment.   Thus, these particular claims are likewise reviewed pursuant to the deferential AEDPA standard.

## II.        Juror Questions

During Petitioner's trial, the jurors were permitted to submit questions to be posed to the witnesses.   The juror's proposed questions were reviewed by the trial judge who determined which, if any, of these questions would be posed to the witness in question.   (Trial Transcript, October 11, 2011, at PageID.621-22).   Petitioner argues that his right to a fair trial was violated by this procedure.   Petitioner does not argue that the review process employed by the trial judge was unfair or otherwise inappropriate.   Instead, Petitioner argues that "the number and nature of the [juror's] questions evidenced that the jury was actively involved in seeking out facts, filling in any perceived gaps in the prosecutor's proofs as to whether [Petitioner] premeditated the killing, and in deliberating before the conclusion of the case."   (ECF No. 1 at PageID.113).

The United States Supreme Court has never clearly established that a criminal defendant's constitutional rights are violated where jurors are permitted to submit questions to a witness.   *See, e.g., Reid v. Balcarcel*, 2018 WL 1993943 at *6 (E.D. Mich., Apr. 27, 2018) (citations omitted).   Moreover, the manner in which the jurors presented their questions did not deprive Petitioner of a fair trial.   The jurors' questions were submitted in writing, after the parties completed their questioning.   Before being presented to the witness, the admissibility of the jurors' questions was determined by the trial judge.   Also, after the jurors' questions were

23

presented, the parties were permitted to further question the witness.   Such procedures and safeguards have been found to sufficiently protect a criminal defendant's constitutional right to a fair trial.   *See, e.g., Baugh v. Quigley*, 2007 WL 2413089 at *6 (E.D. Mich., Aug. 21, 2007); *Wheeler v. Jones*, 2003 WL 124029 at *6 (6th Cir., Jan. 13, 2003).   Accordingly, this claim is without merit.[2]

## III.          Spanking Evidence

As noted above, Brandon Bower testified regarding an incident in December 2009 in which Petitioner spanked him "like thirty" times.   Petitioner argues that he is entitled to relief because admission of this evidence violated his right to a fair trial.   Specifically, Petitioner argues that the testimony in question constitutes improper "bad acts" evidence.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.   *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict."   *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).   This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law."   *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).   Rather, Petitioner must establish that his

---

2  The Court further notes that the specific juror questions to which Petitioner objects were largely repetitive of questions posed by the attorneys.   Moreover, the questions at issue did not result in testimony prejudicial to Petitioner with respect to the fundamental issue at trial, namely whether Petitioner acted with premeditation.

conviction violated the Constitution, laws, or treaties of the United States.  *Id.*   In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not "require a perfect trial," *Clemmons*, 34 F.3d at 358, and, moreover, courts have defined those violations which violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.*   As is well recognized, however, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.   *Bugh*, 329 F.3d at 512-13 ("there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence"); *Burger v. Prelesnik*, 826 F.Supp.2d 997, 1010-11 (E.D. Mich. 2011) (same).   As noted above, in the absence of Supreme Court authority holding that the admission of evidence of prior bad acts violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to habeas relief.   *Bugh*, 329 F.3d at 512-13. Furthermore, as the Michigan Court of Appeals reasonably concluded, the evidence in question was relevant and admissible.   *Bower*, 2013 WL 3107500 at *4-5.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**            **Hearsay Evidence**

Petitioner next argues that he is entitled to relief on the ground that the trial court improperly admitted certain hearsay statements by Heather Bower.   Specifically, Petitioner objects to the following testimony: (1) Sharon Couts' testimony that approximately ten days before Heather Bower was killed, Bower asked Couts to accompany her to Petitioner's residence because she did not want to go there alone; (2) Cathy Wirt's testimony that on the day Heather Bower was killed, Bower told her that Petitioner asked her to meet with him alone at a nearby lake; and (3) Ashley Herman's testimony that Heather Bower told her that Petitioner wanted Bower to deliver to him school pictures of their children.

Petitioner argues that this testimony unfairly supported the prosecution's theory that he acted with premeditation.   As the Michigan Court of Appeals noted, however, even if the testimony in question was improperly admitted, "the prosecution presented ample other evidence that defendant shot the victim with premeditation."   *People v. Bower*, 2013 WL 3107500 at *3 (Mich. Ct. App., June 20, 2013).   Thus, Petitioner's right to a fair trial was not violated.   *Ibid.* This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

**V.**            **Jurisdictional Claims**

Petitioner asserts that he is entitled to relief because jurisdiction to subject him to a criminal trial was never properly established.   Petitioner's claim that the state court lacked jurisdiction under state law to conduct his criminal trial is a matter of state law which is not

26

cognizable in a federal habeas corpus proceeding.   *See Strunk v. Martin*, 27 Fed. Appx. 473, 475 (6th Cir., Nov. 6, 2001); *Nelson v. Jackson*, 2017 WL 5624278 at *2 (6th Cir., July 17, 2017). Accordingly, this claim is rejected.

**VI.**          **Jury Instructions**

Petitioner argues that he is entitled to relief due to an error in the manner the trial court instructed the jury.   Specifically, Petitioner argues that the trial court violated Michigan law by failing to instruct the jury, prior to the introduction of evidence, as to the elements of the crimes with which Petitioner was charged.

As has been recognized, there is no Supreme Court authority which requires that the jury be instructed as to the elements of the offenses at issue as a prerequisite for the admission of evidence.   *See Susalla v. Berghuis*, 2017 WL 2571728 at *7-8 (E.D. Mich., June 14, 2017). As for Petitioner's assertion that the trial court's actions violated state law, habeas relief is not available for alleged violations of state law.   *See* 28 U.S.C. § 2254(a).

Habeas relief is not appropriate merely because jury instructions "contain technical and unsubstantial errors."   *Fears v. Bagley*, 462 Fed. Appx. 565, 578 (6th Cir., Feb. 16, 2012). Instead, relief is available only where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."   *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991)).   Moreover:

> It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.   In addition, in reviewing an ambiguous instruction. . .we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.   And we also bear in mind our previous admonition that we have defined the

27

category of infractions that violate fundamental fairness very narrowly.

*Fears*, 462 Fed. Appx. at 578 (quoting *Estelle*, 502 U.S. at 72-73).

Prior to the presentation of evidence, the jury was instructed as to the crimes with which Petitioner was charged.  (Trial Transcript, October 11, 2011, at PageID.454).  At the conclusion of the proofs, prior to the outset of the jury's deliberations, the jury was instructed as to the specific elements of the crimes with which Petitioner was charged.  (Trial Transcript, October 14, 2011, at PageID.1413-19).  Petitioner does not allege that these instructions were erroneous or incomplete.  Because the jury was properly instructed, Petitioner cannot establish that the trial court's jury instructions rendered his trial fundamentally unfair.  Accordingly, this claim is rejected.

**VII.         Cumulative Effect Claim**

Petitioner next asserts that his right to a fair trial was violated by "cumulative effect" of the many errors that occurred at his trial.   As the Sixth Circuit has made clear, however, habeas relief cannot be premised upon an alleged accumulation of errors.  *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"); *see also*, *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (same).   Accordingly, this claim is rejected.

**VIII.        Competency Claims**

Petitioner argues that he is entitled to relief because his trial was conducted in the absence of a determination that he was competent to stand trial.   As the Sixth Circuit recently observed, it is well-established that "the criminal trial of an incompetent defendant violates due process."  *Carter v. Bogan*, 900 F.3d 754, 768-69 (6th Cir. 2018) (citations omitted).   A criminal

28

defendant is not competent to stand trial if he "lacks either a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or a rational as well as factual understanding of the proceedings against him."   *Id.* at 769 (citation omitted).

Where there exists "substantial doubt" as to a defendant's "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense," the trial court is obligated to conduct an evidentiary hearing on the matter. *Ibid.* (citations omitted).   With respect to when a trial court is obligated to conduct an evidentiary hearing regarding the defendant's competency, the Sixth Circuit has articulated the following test:

> whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.   Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but. . .even one of these factors standing alone may, in some circumstances, be sufficient.   Where, however, a trial court has already held a competency hearing and deemed the defendant competent, it need not reevaluate its determination unless presented with qualitatively different evidence.

*Ibid.* (citations omitted).

On January 6, 2011, the trial court ordered that Petitioner be evaluated with respect to his competence to stand trial.   (ECF No. 7-21 at PageID.1944).   The subsequent examination was conducted by Ellen Garver, Ph.D. who concluded that Petitioner was "competent to stand trial."   (ECF No. 7-21 at PageID.1944-48).   Petitioner argues that this assessment is infirm because Dr. Garver failed to take into consideration the injuries he suffered in a March 2010 automobile accident.   This is simply inaccurate as Dr. Garver expressly considered this particular aspect of Petitioner's medical history.   (ECF No. 7-21 at PageID.1945).

29

The trial court denied this claim, finding it to be without merit.   *People v. Bower*, File No. 2010-9801-FC, Order (Newaygo County Cir. Ct., Apr. 14, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IX.        Ex Post Facto Claim

Pursuant to the Michigan Crime Victim's Rights Act (CVRA), convicted felons are assessed a fee.   *See* Mich. Comp. Laws § 780.751 *et seq.*   As of the date Petitioner killed Heather Bower, the fee imposed upon convicted felons was sixty dollars, but as of the date Petitioner was sentenced the fee imposed upon felons had been increased to one hundred thirty dollars.   *Bower*, 2013 WL 3107500 at *6.   At sentencing, Petitioner was assessed the larger fee.   Petitioner argues that imposition of a fee based upon a change in the law implemented after he committed the offenses in question violates his rights under the ex post facto clause of the United States Constitution.   This claim is not cognizable in a habeas action.   *See Hoover v. Trierweiler*, 2018 WL 1709028 at *8 (E.D. Mich., Apr. 9, 2018) ("Petitioner's challenge to the imposition of fines and costs [under the Michigan CVRA] by the sentencing court is non-cognizable on habeas review").   Accordingly, this claim is rejected.

## X.        Ineffective Assistance of Counsel

Petitioner next asserts that he is entitled to relief on the ground that he was denied the right to the effective assistance of both trial counsel and appellate counsel.   Specifically, Petitioner argues that his trial counsels' performance was deficient in the following ways: (1) by

30

failing to object to testimony that Petitioner spanked Brandon Bower; (2) by failing to move to disqualify the prosecuting attorney; (3) by failing to object to the trial court's lack of jurisdiction; (4) by failing to object to the trial court's failure to consider the issue of Petitioner's competency to stand trial; and (5) by failing to object to trial court's failure to properly instruct the jury. Petitioner alleges his appellate counsel rendered ineffective assistance by failing to assert the aforementioned issues on appeal.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   In the context of a

31

sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for counsel's errors, he would have received a more favorable sentence.  *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 562 U.S. at 122.   Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.* (citations omitted).   As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

32

A.    Spanking Testimony

The Michigan Court of Appeals held that the evidence that Petitioner spanked his son was relevant and admissible.  *Bower*, 2013 WL 3107500 at *4-5.  Accordingly, the Michigan Court of Appeals rejected Petitioner's claim that his trial counsel was ineffective for failing to object to this testimony, on the ground that counsel was not obligated to assert meritless objections.  *Bower*, 2013 WL 3107500 at *5.  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.  As for Petitioner's claim that his appellate counsel was ineffective for failing to assert this issue, such is rejected because his appellate counsel did, in fact, assert this issue on Petitioner's appeal as of right in the Michigan Court of Appeals.

B.    Disqualification of the Prosecutor

The attorney that prosecuted Petitioner was Robert Springstead who was appointed to serve as Newaygo County Prosecutor on October 30, 2010.  (Hearing Transcript, November 9, 2012, at PageID.1465).  His prosecution of Petitioner was "one of the first cases" Springstead handled as Prosecuting Attorney.  (Hearing Transcript, November 9, 2012, at PageID.1465). Prior to Petitioner's trial, Springstead had conducted only one jury trial regarding an embezzlement charge against a public official.  (Hearing Transcript, November 9, 2012, at PageID.1469-70). Springstead's prosecution of Petitioner was his first attempt at prosecuting a murder case. (Hearing Transcript, November 9, 2012, at PageID.1470).

33

Long before becoming a prosecutor, Springstead represented Petitioner in two separate matters.  In 2002, Springstead represented Petitioner in his attempt to obtain dismissal of a Personal Protection Order obtained against him by Heather Bower.  (Hearing Transcript, November 9, 2012, at PageID.1462-64).  Also, in 2003, Springstead represented Petitioner in a criminal matter in which Petitioner was charged with domestic violence against Heather Bower.  (Hearing Transcript, November 9, 2012, at PageID.1456-58).  The charges against Petitioner were subsequently dismissed.  (Hearing Transcript, November 9, 2012, at PageID.1458-62).  Springstead also testified that by the time he prosecuted Petitioner for the murder of Heather Bower he no longer had any memory of the circumstances surrounding his long ago representation of Petitioner.  (Hearing Transcript, November 9, 2012, at PageID.1474).

Petitioner argues that his trial counsel was ineffective for failing to move to have Springstead disqualified from prosecuting him for the killing of Heather Bower.  Petitioner's trial attorney, Shawn Davis, testified that he expressly discussed this matter with Petitioner.  (Hearing Transcript, November 9, 2012, at PageID.1478-80).  According to Davis, Petitioner was "not impressed" by Springstead's performance during the course of a two-day Preliminary Examination early on in this matter.  (Hearing Transcript, November 9, 2012, at PageID.1481-82).  Furthermore, Davis, was concerned that if he moved to disqualify Springstead, Petitioner would be prosecuted by "a much more experienced prosecutor."  (Hearing Transcript, November 9, 2012, at PageID.1480-81).  According to Davis, Petitioner did not want to move to disqualify Springstead.  (Hearing Transcript, November 9, 2012, at PageID.1481).  Specifically, Petitioner "thought he might get better offers from [Springstead], and he didn't think that [Springstead] was very experienced as a prosecutor."  (Hearing Transcript, November 9, 2012, at PageID.1481).

34

Accordingly, Davis made the strategic decision to not move to disqualify Springstead from prosecuting Petitioner.   (Hearing Transcript, November 9, 2012, at PageID.1482).

The Michigan Court of Appeals denied Petitioner's claim that his trial attorney was ineffective for failing to move to disqualify Springstead in this matter.   *Bower*, 2013 WL 3107500 at *6.   Specifically, the court stated:

> We granted defendant's motion to remand for a *Ginther* hearing to address this particular claim of ineffective assistance of counsel. At the *Ginther* hearing, defendant's trial counsel acknowledged that he was aware that the prosecutor had previously represented defendant in a 2002 PPO matter involving the victim and a 2003 domestic violence case, in which defendant was charged with assaulting the victim.   However, trial counsel testified that after discussing the matter with defendant, he chose not to move to disqualify the prosecutor, who had only recently been appointed to office and had never prosecuted a murder case.   The record supported that the prosecutor did not utilize at trial any personal knowledge regarding his previous representation of defendant. The trial court concluded that trial counsel was not ineffective for opting not to seek disqualification of the prosecutor.   Given the circumstances of the instant case, and that fact that trial counsel possesses "wide discretion in matters of trial strategy," defendant has not "overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances."

*Bower*, 2013 WL 3107500 at *6 (internal quotations omitted).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.   As for Petitioner's claim that his appellate counsel was ineffective for failing to assert this issue, such is rejected because his appellate counsel did, in fact, assert this issue on Petitioner's appeal as of right in the Michigan Court of Appeals.

C.      Issues Raised by Petitioner in his Motion for Relief from Judgment

The other three issues identified above, the jurisdictional, competency, and jury instruction issues, were not raised by Petitioner's trial or appellate counsel, but were instead raised in the first instance by Petitioner in his post-conviction motion for relief from judgment.

As discussed above, the Court ordered that Petitioner's competency be assessed. This assessment determined that Petitioner was competent to stand trial.  While Petitioner engages in a great deal of speculation regarding this issue, Petitioner has failed to identify evidence in the record which calls into question the determination that he was competent to stand trial. Accordingly, Petitioner can neither establish that his counsel were ineffective or that he suffered prejudice from their allegedly deficient performance.

Regarding Petitioner's jury instruction claim, as also discussed above, this issue is without merit.  It does not constitute ineffective assistance to fail to assert meritless claims. Moreover, even if the Court assumes that counsel were somehow ineffective for failing to pursue this issue, Petitioner has failed to persuade the Court that he suffered any prejudice therefrom.

Finally, Petitioner has failed to establish that the Newaygo County Circuit Court lacked jurisdiction to try him for the murder of Heather Bower.  Moreover, even if the Court indulges Petitioner and assumes that there existed some sort of technical jurisdictional shortcoming as Petitioner alleges, Petitioner has failed to demonstrate that such could not have easily been rectified.  Thus, Petitioner cannot establish that he was prejudiced by his counsels' allegedly deficient performance.

The trial court denied these claims on the ground that they were all without merit. *People v. Bower*, File No. 2010-9801-FC, Order (Newaygo County Cir. Ct., Apr. 14, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly

36

established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, these claims raise no issue upon which habeas relief may be granted.

## XI.        Denial of Counsel

Lastly, Petitioner asserts that he is entitled to relief because his attorney "abandoned" him at trial.   Specifically, Petitioner argues that the following shortcomings by his trial counsel constituted "abandonment" of his obligations to Petitioner: (1) counsel failed to object to the trial court's lack of jurisdiction; (2) counsel failed to object to the trial court's failure to consider the issue of Petitioner's competency to stand trial; and (3) counsel failed to object to trial court's failure to properly instruct the jury.

The right of a criminal defendant to be effectively represented by counsel is well established.   Without the effective assistance of counsel, "the right to a trial itself would be of little avail."   *United States v. Cronic*, 466 U.S. 648, 654 (1984).   Generally, to demonstrate a violation of the right to the effective assistance of counsel, a criminal defendant must demonstrate that his attorney rendered deficient performance and that he suffered prejudice resulting therefrom. *Id.* at 658; *see also, Strickland*, 466 U.S. at 687.   As the *Cronic* Court observed, "there are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."   *Cronic*, 466 U.S. at 658.   In other words, in certain circumstances, a court must simply presume that a defendant suffered prejudice, of a constitutional magnitude, as a result of his attorney's deficient performance.   *Id.* at 658-61.

This presumption may arise in three types of circumstances: (1) when the accused is denied the presence of counsel at a critical stage of the proceedings; (2) when counsel does not

subject the prosecution's case to any meaningful adversarial testing; and (3) when counsel is placed in circumstances in which competent counsel very likely would be unable to render effective assistance.  *See Henness v. Bagley*, 644 F.3d 308, 323 (6th Cir. 2011) (citing *Bell*, 535 U.S. at 695-96).   The presumption of prejudice recognized in *Cronic*, however, is a "narrow exception" to the actual prejudice requirement under *Strickland*.   *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

Petitioner asserts that he is entitled to the presumption of prejudice and, therefore, relief, because his trial attorney "abandoned" him at trial.   However, none of Petitioner's alleged instances of abandonment satisfy the narrow exception to the general rule that Petitioner must demonstrate that he was prejudiced by his attorney's allegedly deficient performance.   Instead, these particular claims must be analyzed under the familiar *Strickland* standard.   As discussed above, however, these claims all fail under this analysis.

The trial court denied this claim, finding it to be without merit.   *People v. Bower*, File No. 2010-9801-FC, Order (Newaygo County Cir. Ct., Apr. 14, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Bower's petition for writ of habeas corpus be **denied**.   The undersigned further recommends that a certificate of appealability be denied.   *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: November 2, 2018                    /s/ Ellen S. Carmody
                                         ELLEN S. CARMODY
                                         United States Magistrate Judge